UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICAH LYNN EVANS,

                    Petitioner,                    Case No. 20-11077

v.                                                 HON. MARK A. GOLDSMITH

GREGORY SKIPPER,

                    Respondent.
_____/

## OPINION & ORDER
## (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DENYING A CERTIFICATE OF APPEALABILITY, AND (3) GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

Petitioner Micah Lynn Evans filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in Michigan's Isabella Circuit Court of third-degree criminal sexual conduct, Mich. Comp. L. § 750.520d; assault with intent to commit sexual penetration, Mich. Comp. L. § 750.520g; and domestic violence – third offense, Mich. Comp. L. § 750.81(4). Petitioner was sentenced as a fourth-time habitual felony offender to concurrent prison terms, the longest of which is 30–50 years for his criminal sexual conduct conviction.

The petition raises three claims: (i) Petitioner was denied his counsel of choice when the trial court forced him to fire his retained attorney in exchange for an adjournment of the trial date, (ii) Petitioner's trial counsel was ineffective for failing to object to the admission of prior bad acts evidence, and (iii) the trial court erroneously admitted expert testimony regarding domestic violence, and trial counsel was ineffective for failing to counter the testimony.

The Court denies the petition because the claims are without merit.  The Court also denies a certificate of appealability and grants Petitioner leave to proceed in forma pauperis on appeal.

## I. BACKGROUND

The charges against Petitioner stem from an incident with his girlfriend that occurred at his Isabella County trailer on August 1, 2014.

The complainant, here referred to by her initials JB, knew Petitioner since childhood. The two were in a dating relationship and living at Petitioner's trailer, even though a condition of Petitioner's parole was that he was not to have contact with JB.  Jury Trial Tr. Vol. I at 145–152 (Dkt. 9-4).

JB testified at trial that, on the date of the incident, she was in the trailer with her five-year-old daughter when Petitioner came home for lunch.  Id. at 148–162.  The two started arguing after Petitioner complained that JB did not want to have sex as much as he did.  Id.  JB did not want to be intimate with Petitioner at the time because she was feeling ill, and her daughter was present. Id.  Petitioner did not accept her response, and he started throwing food at her.  Id.  Petitioner then hit JB in the back of the head, took her cell phone away, dragged her by her hair into the bathroom, and held the door shut.  Id.

JB pleaded with Petitioner to let her out because her daughter was crying.  Id. at 163–168. Petitioner let her out, and she went into the bedroom to console her daughter.  Id.  Petitioner followed her into the bedroom and refused to leave.  Id.  He grabbed JB by the hair and dragged her into the bathroom again.  Id.

Petitioner then ripped off JB's clothes while she pleaded with him to stop.  Id. at 169–170. JB yelled for her daughter to call for help.  Id.  Petitioner slapped JB in the face, and he told her that if she tried that again her daughter would be next.  Id.  While JB tried to push, scratch, and

hold her legs closed, Petitioner was able to forcefully turn her body so that he could penetrate her vagina with his penis.  Id.  Petitioner then masturbated onto JB's stomach.  Id.  JB pleaded with Petitioner to stop during the entire episode.  Id. at 171–178.

JB wiped herself off and went into the bedroom to console her crying daughter.  Id. at 178–187.  Petitioner came back into the room and offered to drive JB somewhere.  Id.  JB asked him to drive her to the house of Kenneth Dell, a mutual friend.  Id.  When they arrived at Dell's residence, Petitioner spent time with Dell outside while JB went inside.  Id.  Eventually Dell came into the house where JB was crying on the couch.  Id.  Dell asked JB what happened, and she told him that Petitioner had raped her.  Id.

JB went upstairs, where she called her ex-husband and told him what happened.  Id. at 187–194.  He told her to call the police, and he drove to Dell's house to pick her up.  Id.  He then drove her to the state police post.  Id.  JB reported the assault to a state trooper.  Id.  JB refused to submit to medical treatment or a rape kit.  Id.  She testified that she felt like she was not emotionally able to submit to such an exam.  Id.

That night Petitioner sent JB multiple texts.  Id. at 198, 206.  Screenshots of the messages were admitted at trial and read into the record.  Id.  In one text message sent shortly after Petitioner left JB at Dell's house, Petitioner stated, "I'm not okay with what has happened here today. I'm sure I know I'm going to burn in hell for what I've done, but it's my choice I have to live with." Id. at 202.  He also wrote "there is no excuse for the things that I've done, but I'm honestly sorry for it." Id. at 203.  Petitioner stated, "I realize I'm just crazy and I don't ever want to see you have to go through that again, and it was not right, that was not love." Id.  Petitioner expressed concern that JB would go the police: "I know I fucked up big time and you want me to suffer, but just tell me if I need to worry about the police." Id. at 204.  JB did not respond to the text messages.

3

The next day, August 2, 2014, Petitioner contacted JB again through Facebook.  Id. at 211.

This time JB responded to Petitioner by stating, "you raped me Micah, you fu*king raped me.

There is a special place in hell for you."  Id.  Petitioner agreed, stating the following:

> There is a place in hell for me and I know you're going to use all that I send you, that's supposed to be, as evidence but I'm still going to sit here and beg for your help.  On another day I could explain what my intentions were in my [mind] but it won't ever make it right.  Will you at least tell me if it was you that called the cops or someone else? . . . I know you hate me, but if you didn't call them and you didn't want this to happen eighter.  And then cause you love [Petitioner's son] and rather you think it or not he needs me.  If the shoe was on the other foot I wouldn't take you from your kids and you know that's true.

Id.

While this exchange was taking place, JB was using her Facebook application to identify

Petitioner's location and relay the information to police.  Id. at 211–212.  Police arrested Petitioner

in his car, ending the Facebook exchange.  Id.

JB also testified to prior acts of domestic violence.  She testified that in 2011, Petitioner

assaulted her, threatened her with a gun, and fired it as she ran from the house.  Id. at 213–215.

Petitioner pled guilty to domestic violence as a result of the incident.  Id. at 185–186.

JB testified that Petitioner assaulted her again in 2012.  Id. at 218, 222.  Petitioner blocked

JB from leaving his residence, brought her to the ground, and then kneed her in the ribs while he

held her down.  Id. at 219–220.  Petitioner pled guilty to domestic violence, second offense, for

the incident.  Id. at 222.

JB's sister picked up JB's daughter after the incident at the police post.  Jury Trial Tr. Vol.

II at 79 (Dkt. 9-5).  JB was shaking, crying, and chain smoking.  Id. at 79–80.  JB's sister had never

seen JB in that degree of distress.  Id.

JB's ex-husband testified that JB called her on the afternoon of August 1, 2014.  Id. at 91–

92.  She was hysterical and crying.  Id.  JB kept repeating "he raped me."  Id.  Eventually, she told

4

him that it was Petitioner who raped her. <u>Id.</u> He called 9-1-1 and then drove to Dell's house to pick up JB and their daughter. <u>Id.</u> at 93–94.

Michigan State Police Trooper Casey Lalone testified that JB and her ex-husband arrived at the post during the late afternoon of August 1, 2014. <u>Id.</u> at 102. They reported a rape. <u>Id.</u> JB was very upset and crying, so Lalone had her make a written statement. <u>Id.</u> at 106. Troopers located Petitioner with JB's assistance the next day. <u>Id.</u> at 107.

The prosecution presented the testimony of Holly Rosen, a social worker and the director of Michigan State University (MSU) Safe Place, a program at MSU for survivors of domestic violence. <u>Id.</u> at 125–127. Rosen largely testified about the general characteristics of relationships in which domestic violence occurs and the typical characteristics exhibited by the perpetrators and victims. <u>Id.</u> at 125–182. Rosen was qualified as an expert "in domestic violence and sexual assault and under for specific categories; non-intuitive victim responses, domestic violence perpetrator tactics, context and serial nature of domestic violence regarding patterns." <u>Id.</u> at 135–136. The Court indicated that there had been discussions about the limits of what Rosen could testify to, and the prosecutor stated to Rosen in response that "you cannot basically use the information or data or your research to compare it with the particular facts of this case." <u>Id.</u> at 137.

In describing domestic abusive relationships, Rosen testified that sexual assault is often included as a dynamic of the abusive relationship. <u>Id.</u> at 138. She explained how, based on neurobiological studies, the trauma resulting from assaults will often negatively impact a victim's response to abusive situations and also affect their memory of abusive incidents. <u>Id.</u> at 139–140. Rosen herself had worked with over 2,000 victims of domestic violence. <u>Id.</u> at 142. She estimated that 75–80% of the victims she encountered have been sexually assaulted in the context of their abusive relationships. <u>Id.</u> at 143.

5

Rosen described the typical characteristics and dynamics at play in relationships involving domestic violence.  Id.  The perpetrator often enforced control rules, would often discredit the victim's beliefs, and would try to shift blame onto the victim.  Id. at 144–149.  Meanwhile the victim would often "walk on eggshells," blame themselves for the abuse, lie to themselves, and perform actions aimed at appeasing the abuser.  Id.

When asked by the prosecutor whether a batterer is making a choice to be an abuser, Rosen responded that "it's a hard thing to rewire someone who is a batterer," but that there is an element of choice.  Id. at 150.  Rosen explained how it is often confusing for the victim, because bad times are often mixed in with good times with their batterer.  Id.  Ending an abusive relationship is one of the hardest things for a victim to do because it often results in increased "separation violence." Id. at 151–152.  In that vein, Rosen testified that Department of Justice (DOJ) statistics show that on average three women die per day as a result of domestic violence, and often that happens when they attempt to leave their abuser.  Id. at 152.  Rosen testified that the statistics from the Centers for Disease Control and Prevention (CDC) show that one out of four women and one out of nine men will be victims of domestic abuse at some point in their lives.  Id. at 152–153.

Rosen was asked about whether batterers and victims lie about domestic violence.  She testified that it was common for batterers to lie.  Id. at 154–155.  They are masters of obfuscation and have a sense of entitlement that leads them to lie to their victims.  Id. at 155–156.  Rosen did not testify about batterers lying to authorities or in court.  The examples she gave involved the reasons and dynamics that lead batterers to lie to their domestic partner.  Id.  Rosen testified that battered victims also lie "all the time" and do so in the context of trying to stay safe or make their batterer look good.  Id. at 156.  She explained that in her experience it was "very rare" for a victim to lie that abuse happened when it did not.  Id. at 156–157.  Such false allegations usually happened

when a person was attempting to get services they needed.  <u>Id.</u>  Rosen testified that "making it up

when it didn't happen is very rare."  <u>Id.</u> at 157.

Rosen testified about the forensic interview protocols for victims of domestic abuse.  <u>Id.</u> at

157–158.  She explained that sometimes there was a need to scare victims into seeking medical

treatment during an interview if a head injury was at issue.  <u>Id.</u>  As relevant to one of Petitioner's

claims, Rosen mentioned the use of Google; she stated that she would tell clients to use Google to

research the severity of untreated head injuries when they said they did not want to seek medical

treatment.  <u>Id.</u>  Rosen explained why some victims might not want to undergo examination for

domestic abuse.  <u>Id.</u> at 159–160.  She testified that "with sexual assault you need immediate care,

and that's just too difficult for many victims in trauma from the sexual assault."  <u>Id.</u> at 161.  Victims

usually do not call the police after abuse.  <u>Id.</u> at 162.  They often have a false sense that the abuse

will stop on its own.  <u>Id.</u>

Rosen also explained why victims often stay in abusive relationships.  <u>Id.</u> at 165–166.  She

explained that it is not uncommon for victims to do ordinary things with their abuser right after an

incident of abuse.  <u>Id.</u> at 167.  She further testified about how some injuries are obvious visually,

and others are not.  <u>Id.</u> at 169–170.  She explained again that she had dealt with a lot of victims

over her 35-year career and that, many times, injuries from abuse are not visible.  <u>Id.</u> at 170–173.

On cross-examination, Rosen conceded that she was only testifying to "accepted principles

within [her] field" and her experience, but that her testimony had "no application based on [her]

personal knowledge as to any facts in this prosecution."  <u>Id.</u> at 175.

Defense counsel questioned Rosen regarding her knowledge of the American Professional

Society Handbook on Sexual Abuse, with which Rosen was unfamiliar.  <u>Id.</u> at 175–176. Counsel

obtained Rosen's concession that false reports are possible, and she testified, "I would imagine if

somebody is doing a false report they're either doing it to get attention or to get someone prosecuted" or because of mental illness.  Id. at 177.  When asked if a history of mutual abuse between parties would interest her, Rosen said she would be happy to analyze "the facts of the case," but the court interjected that she could only testify in general terms.  Id. at 178–179.  With respect to hypothetical situations with a female perpetrator and a male victim, Rosen testified that the dynamics are more dysfunctional, and that it "could have elements of emotional abuse, physical abuse, use of throwing things . . . and that's differentiated from domestic violence in that it doesn't result in a power differential . . . . "  Id. at 181–182.

Petitioner presented several defense witnesses.  Paula Logan, JB's former friend and roommate, testified that in 2011 JB had a love-hate relationship with Petitioner.  Id. at 189–191.  JB told Logan that she would "do anything" to keep Petitioner away from other women but that she was nevertheless "heartless" towards Petitioner.  Id.  Logan then met Petitioner in May 2014, and they were at the time of the trial close friends.  Id. at 201–202.

Jeremy Lewis testified that he was present for the incident on August 1, something JB had denied during her testimony.  Id. at 213–214.  Lewis described JB as being upset and starting the argument with Petitioner about him being with another woman.  Id. at 216.  Lewis claimed JB was cussing and throwing things around the trailer, but she eventually calmed down. He testified that Petitioner never struck or otherwise touched JB.  Id. at 220–221.  On cross-examination it was revealed that Lewis was diagnosed with several major mental illnesses and was taking a list of medications to treat them, that he had difficulties with his memory as a result, and he had been addicted to opiates.  Id. at 225–257.  Lewis was unaware of Petitioner's prior guilty plea convictions to domestic violence.  Id.

8

Kenneth Dell testified that he was at home on August 1 when Petitioner and JB unexpectedly arrived at his house. Id. at 267. Dell testified that when JB got out of the car, she walked up to Petitioner, put her leg around him, and gave him a big hug and kiss. Id. at 268. JB and her daughter then went inside Dell's house. Id. at 269. JB did not appear upset or disheveled. Id. at 270–271. Petitioner took Dell for a ride to tell him that he had just broken up with JB, and he asked if she could stay at Dell's house. Id. at 274. When Dell returned to his house, JB confirmed that Petitioner had broken up with her. Id. Dell testified that JB never said anything about being raped, and he never had to console her. Id. JB mentioned something about Petitioner raping her only as she walked out of Dell's house to meet her ex-husband. Id. at 276. On cross-examination, Dell testified that Petitioner became like a "second son" to him after his own son had died. Id. at 285.

Petitioner testified in his own defense that he arrived at his trailer with Lewis on the date of the incident. Id. at 304–330. His account largely mirrored that given by Lewis and Dell. Id.

Based on this evidence, Petitioner was convicted and sentenced as indicated above. Petitioner filed a claim of appeal in the Michigan Court of Appeals. His appellate counsel filed a brief on appeal that raised four claims:

I. Did the trial court violate both the Michigan and Federal Constitutions by denying Appellant his counsel of choice resulting in structural error and mandating that he be given a new trial?

II. Was Defendant denied his right to the effective assistance of counsel where trial counsel failed to object to the admission of prior acts of domestic violence under MCL 768.27(b) and the trial court never conducted an analysis pursuant to MRE 403 violating Appellant's constitutional due process rights?

III. Did the trial court err in allowing Holly Rosen to testify as an expert witness without conducting the prior analysis under MRE 702 and 703[. D]id the prosecution fail to comply with MCR 6.201 and was trial counsel ineffective in failing to challenge Ms. Rosen's credentials and failing to adequately cross-examine her?

IV. Is Appellant's sentence of 30 years an unreasonable and disproportionate upward departure from his recommended guideline range?

Petitioner also filed his own supplemental pro se brief in the Court of Appeals that raised

an additional six claims:

I. Was the Defendant denied an opportunity to review and refute the information contained in the presentence investigation report?

II. Did trial counsel fail to contact relevant witnesses request by the Defendant?

III. Was the Defendant deprived of a fair trial where Defendant was barred by the trial judge to introduce relevant evidence?

IV. Was the Defendant denied his right to effective assistance of counsel, where trial counsel made several outcome determinative errors?

V. [Did] the pseudo-scientific evidence and the introduction of junk science at trial deny the Defendant of a fair trial?

VI. Was the Defendant denied his right to a speedy trial?

The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished

opinion. People v. Evans, No. 335327, 2018 WL 2067794, at *1 (Mich. Ct. App. May 3, 2018).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court that raised

the same claims presented to the Court of Appeals. The Michigan Supreme Court denied the

application for leave to appeal by standard order. People v. Evans, 922 N.W.2d 110 (Mich. 2019).

## II. STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d)(1) curtails federal habeas review of state convictions for claims

adjudicated on the merits by state courts. A habeas petitioner must demonstrate that the state court

adjudication was "contrary to" or "involved an unreasonable application of" clearly established

Supreme Court law. 28 U.S.C. § 2254(d)(1).

A decision is "contrary to" clearly established Supreme Court law if the state court arrives

at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state

court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405–406 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409.

Under this standard, a federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 410–411. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

### III. DISCUSSION

#### A. Habeas Petition

The Court discusses each of Petitioner's claims for relief in turn.

#### 1. Counsel of Choice

Petitioner first claims that he was denied his retained counsel of choice when the trial court forced him to fire his counsel in exchange for an adjournment of the trial date. After reciting the constitutional standard and finding the claim unpreserved for review, the Michigan Court of Appeals rejected the claim on the merits by rejecting the factual premise:

> On April 22, 2016 the parties appeared before the trial court for a settlement conference. Defendant's counsel, Dwight Carpenter, discussed the fact that his client was seeking a second adjournment of the trial date. Carpenter offered two reasons for the request: 1) that he and defendant were having "some problems," and 2) that defendant was being released from prison the day before trial was to begin and needed time to participate in the preparation of his defense. Carpenter also mentioned that he had told defendant that the grant of a second adjournment with him as counsel was highly unlikely, and that firing him was a more likely route to obtain the additional time. Defendant agreed that he was having problems with Carpenter and that it was his desire to hire a new attorney. In fact, Carpenter had

told the trial court three months prior at the February 2016 settlement conference, when defendant sought and obtained his first adjournment, that defendant was contemplating hiring co-counsel or firing him.

On appeal, defendant argues that he was forced to fire Carpenter in order to obtain an adjournment so that he could prepare his defense. Carpenter supports defendant and avers by affidavit to this Court that he requested an adjournment of the trial date due to a scheduling conflict, was denied, and that he informed defendant that the only way the trial court would grant another adjournment was if he fired him and hired new counsel. However, Carpenter's affidavit contradicts his statements on the record, as do defendant's arguments in this appeal. Furthermore, Carpenter's statements at the April 22, 2016 hearing appear to waive any prayer for an adjournment of the trial date with him remaining as counsel. To the extent the trial court purportedly indicated its intention to deny such a request, had it been presented on the record, we would not deem that decision to be an abuse of discretion. Defendant has not established plain error under the circumstances.

Evans, 2018 WL 2067794, at *2 (footnotes omitted).

Under the Sixth Amendment, a criminal defendant "shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. This includes the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though the defendant is without funds. United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006). Deprivation of the right is complete when a defendant is erroneously denied counsel of choice; the defendant need not show prejudice or demonstrate that the counsel he or she received was ineffective. Id. at 148. However, "the right to counsel of choice 'is circumscribed in several important respects.'" Id. at 144 (quoting Wheat v. United States, 486 U.S. 153, 159 (1988)). One of those respects is that trial courts retain "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." Id. at 152 (punctuation modified). Nevertheless, "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." Morris v. Slappy, 461 U.S. 1, 11–12 (1983) (quoting Ungar v. Sarafite, 376 U.S. 575, 589 (1964)).

Here, the Michigan Court of Appeals found that Petitioner's right to retained counsel of choice was not violated because the trial court never forced him to fire his counsel. That is, the state court made a factual determination that the attorney Petitioner fired was <u>not</u> his counsel of choice and that he desired to retain a new attorney. Petitioner's claim amounts to an attack on this factual determination.

Under 28 U.S.C. § 2254(d)(2), habeas relief may be "warranted where the state-court adjudication 'resulted in a decision that was based on an unreasonable determination of the facts.'" <u>Pouncy v. Palmer</u>, 846 F.3d 144, 158 (6th Cir. 2017) (quoting 28 U.S.C. § 2254(d)(2)). "To show that a state court's determination of the facts was 'unreasonable,' it is not enough that the 'federal habeas court would have reached a different conclusion in the first instance.'" <u>Id.</u> (quoting <u>Wood v. Allen</u>, 558 U.S. 290, 301 (2010)). Instead, a "state court decision involves an unreasonable determination of the facts in light of the evidence presented in the State court proceeding only if it is shown that the state court's presumptively correct factual findings are rebutted by clear and convincing evidence and do not have support in the record." <u>Id.</u> (punctuation modified).

The record reasonably supports the state court's conclusion that it was Petitioner's own choice to fire his first attorney and to retain different counsel and that, therefore, he was not denied his right to counsel of his choice. At the February 19, 2016, settlement conference, in making his first request for an adjournment, Petitioner's counsel stated, "my client is also thinking perhaps to bring in co-counsel or even perhaps to fire me, and so he needs some time to think about that. He's got some decisions he needs to make." 2/19/16 Settlement Conf. Tr. at PageID.939 (Dkt. 9-7).

At the next conference, after the prosecutor stated that she was prepared to proceed with the scheduled trial date, the court addressed Petitioner:

> The Court: All right. All right, I think that the appropriate course of conduct—well I'll ask you Mr. Evans, it sounds like I know there was some discussion previously

that you were—there were some problems that you were having with your attorney. Is that correct sir?

The Defendant: Yes, sir.

The Court: Is it your desire you want to hire a new attorney is that—is that your desire sir?

The Defendant: Yes, sir.

\*\*\*

[Defense Counsel]: . . . I've explained to him that a problem with my schedule and the Court's schedule about an adjournment not being granted because of the timeframes that have already been used up. And due to the fact that the Prosecutor has witnesses including experts lined up. So his only recourse of action which he wants to exercise is to dismiss me from the case and hire probably one of the attorneys that I'm suggesting to him. Thank You, Your Honor.

\*\*\*

The Court: All right. Court will grant the adjournment to allow Mr. Evans to secure a new attorney. I do believe that it is appropriate based on the wishes of Mr. Evans and Mr. Carpenter that it would be appropriate for Mr. Evans to obtain a new attorney . . . .

4/22/16 Settlement Conf. Tr. at PageID.228–230 (Dkt. 9-3).

In view of this record, the Michigan Court of Appeals was not required to accept Petitioner's after-the-fact assertion on appeal that "I did not want to fire Mr. Carpenter." Pet. Aff. at PageID.1081 (Dkt. 9-9). Indeed, at no point during the trial court proceedings did Petitioner ever make any statement to the court that he desired to keep his initial attorney and that he was firing him only because it was the only way to secure an adjournment. Rather, the record reasonably suggests that Petitioner already desired to obtain substitute counsel and no longer wished to proceed with his first retained attorney anyway. Though defense counsel stated Petitioner's "only recourse of action" was to hire a new attorney, there is no indication that Petitioner was firing an attorney he otherwise still wished to retain. Rather, Petitioner first acknowledged that it was his desire to hire a different attorney. A necessary and desirable

14

consequence of Petitioner's decision to retain a new attorney may have been to obtain an adjournment, but the record does not compel the conclusion that Petitioner was trading away his counsel of choice in exchange for an adjournment.

To the contrary, the record reasonably supports that conclusion that Petitioner exercised his right to counsel of choice when he was allowed to fire an attorney he no longer wished to represent him and retain a new one.  It is reasonable to interpret the record as showing that this was not a denial of the right to counsel of choice but an exercise of that right.  Because the premise to Petitioner's claim was rejected based on the reasonable finding of fact by the Michigan Court of Appeals, Petitioner has failed to demonstrate that he is entitled to relief based on this claim.

### 2.   **Prior Acts of Domestic Violence**

Petitioner next asserts that the trial court erred in allowing the admission of prior domestic assaults by Petitioner against JB.  He also asserts that his trial counsel was ineffective for failing to object to the admission of the evidence.  Petitioner argues that the prior assaults were admitted purely to demonstrate Petitioner's propensity to commit violent crimes, which he claims is an unconstitutional use of prior-acts evidence.

The prior acts were admitted under a Michigan law specifically governing the admissibility of prior domestic assaults by a defendant in a case involving domestic violence.  The statute provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403."  Mich. Comp. L. § 768.27b(1).  Unlike prior-acts evidence admitted under Michigan Rule of Evidence Rule 404(b), evidence of prior domestic violence is admissible at trial "to show a defendant's character or propensity to commit the same act," People v. Railer, 792

N.W.2d 776, 780 (Mich. Ct. App. 2010), "as long as the evidence satisfies the 'more probative than prejudicial' balancing test of MRE [Michigan Rule of Evidence] 403," People v. Cameron, 806 N.W.2d 371, 377 (Mich. Ct. App. 2011).  The rule is therefore similar to Federal Rule of Evidence 413(a), which "permits the government to admit evidence of a defendant's prior sexual assaults as propensity evidence 'on any matter to which [the assaults are] relevant.'"  United States v. Mandoka, 869 F.3d 448, 453 (6th Cir. 2017) (quoting Fed. R. Evid. 413(a)) (brackets in Mandoka).

Contrary to the cases cited by Petitioner, the admission of such prior-acts evidence, even if used to establish a propensity to commit domestic assaults, does not entitle Petitioner to habeas relief because there is no clearly established Supreme Court law that holds that a state violates a defendant's due process rights by admitting such propensity evidence.  See Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir. 2003).  Further, in light of the fact that evidence regarding Petitioner's prior domestic assaults would have been admissible against him at a federal trial under Federal Rule of Evidence 413, the Court cannot find that the admission of this evidence at Petitioner's state court trial "was patently unfair, contradicted governing Supreme Court precedent, or resulted in an incorrect and unreasonable application of federal law."  Love v. Carter, 49 F. App'x 6, 12 (6th Cir. 2002).  Petitioner does not attack the constitutionality of § 768.27b(1) or Rule 413.

Petitioner argues that even if such prior acts are generally admissible under § 768.27b(1), his prior assaults should have been excluded under Michigan Rule of Evidence 403 because the impact was more prejudicial than probative.  An argument that a state court misapplied or unreasonably applied Rule 403's balancing test is not cognizable on federal habeas review because it asks the Court to evaluate the state court's application of a state evidentiary rule.  See Seymour v. Walker, 224 F.3d 542, 552 (6th Cir. 2000).  It is well-settled that "alleged errors in evidentiary

rulings by state courts are not cognizable in federal habeas review" unless "the state's evidentiary

ruling is so fundamentally unfair that it rises to the level of a due-process violation."  Moreland v.

Bradshaw, 699 F.3d 908, 923 (6th Cir. 2012) (punctuation modified); see also Estelle v. McGuire,

502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-

court determinations on state-law questions.")

The Michigan Court of Appeals' discussion as to why the prior-acts evidence was not more

prejudicial than probative shows why its admission did not render Petitioner's trial fundamentally

unfair:

> At trial, plaintiff introduced evidence of defendant's 2008, 2011 and 2012 prior
> convictions for domestic violence.  Defendant's position at trial was that the
> incidents alleged by the complainant simply did not happen.  The prior convictions
> were for acts not substantially dissimilar to the conduct alleged in this case.  Per the
> complainant's testimony, in 2011, defendant threw a glass of water in her face,
> dragged her by her hair, and shot a gun into the air, feigning suicide, after he saw
> the complainant's ex-husband at her work.  In 2012, after a verbal altercation, he
> repeatedly spit on the complainant's face and wrestled her to the ground.  In the
> instant offense, he dragged the complainant by her hair and sexually assaulted her
> in the bathroom while her daughter was outside the bathroom.  Defendant argues
> that his trial counsel was ineffective for not objecting to the plaintiff's notice of
> intent to introduce this information and to the complainant's testimony regarding
> other acts of domestic violence.  We disagree.  These objections would have been
> meritless under MCL 768.27b.
>
> Under the statute, in a prosecution for domestic violence, the plaintiff could
> introduce the prior acts for any relevant purpose.  In this case, the other acts were
> probative to show defendant's characteristic scheme to argue with the complainant,
> physically assault her, restrict her movement, and later try to normalize his pattern
> of behavior by equating it to some toxic yet passionate relationship they shared.
> Even if counsel had objected and the evidence been evaluated under MRE 403, the
> court would not have found that defendant was prejudiced.  The other acts were
> highly probative of defendant's propensity to engage in assaultive behavior,
> specifically with this complainant.  The evidence was also not unfairly prejudicial
> because the prior two acts were not of the same magnitude of violence as the instant
> offenses for which defendant was charged[,] and[ ] they fairly represented the
> complainant also arguing with and assaulting defendant, and violating no contact
> orders.  Any prejudice was further minimized by the court's reading of M Crim JI
> 4.11 to the jury that limited the purposes for which the evidence could be used.
> People v. Roper, 286 Mich. App. 77, 106 (2009).  Defendant lastly cannot

> demonstrate that there is a reasonable probability that the outcome of the proceedings would have been different because the jury still had to consider the complainant's testimony and defendant's text and Facebook messages to the complainant that appeared to agree with the complainant's accusations against him.

Evans, 2018 WL 2067794, at *3. For the reasons provided by the state court, it was not fundamentally unfair to admit the prior acts. The prior acts tended to show that JB's account of the incident was more likely to be true given Petitioner's similar prior assaultive conduct against her.

Finally, with respect to Petitioner's claims that his attorney should have objected to admission of the prior acts, the court's conclusion that the evidence was properly admitted undermines the claim. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." Coley v. Bagley, 706 F.3d 741, 752 (6th Cir. 2013).

Petitioner's second claim is without merit.

### 3. Admission of Expert Testimony

Petitioner's final and strongest claim is that his trial was rendered fundamentally unfair by the admission of testimony from the prosecutor's expert witness, Holly Rosen, and that his counsel was ineffective for failing to effectively counter her testimony.

Petitioner's habeas brief shifts the particular allegations from the ones presented to the state courts in his appellate counsel's brief and in his pro se supplemental brief. As the Court reads habeas counsel's brief, Petitioner now first argues that the prosecutor failed to comply with a discovery demand and order, setting the stage for defense counsel's ineffectiveness. He argues that counsel should have objected to Rosen, a social worker, from testifying about: (i) the visibility of medical injuries suffered by domestic abuse victims, (ii) the neurobiology of trauma responses, (iii) federal crime statistics, (iv) the psychological difficulty of "rewiring" a sexual abuser, (v) the

unlikelihood of false allegations of abuse, and (vi) that domestic violence and sexual assault are serial crimes that the perpetrator does over and over again.

Petitioner asserts that defense counsel failed to object to these items as either outside Rosen's area of expertise or because they exceeded the proper bounds of opinion testimony. Petitioner argues that defense counsel should have consulted with a defense expert to assist him in countering Rosen's testimony. Petitioner finally asserts that the state court's conclusion that any error was harmless was unreasonable because Rosen's improper testimony was critically important in this word-against-word case. Petitioner states that he is entitled to an evidentiary hearing because one was requested in his pro se supplemental brief filed in the Michigan Court of Appeals.

To the extent that Petitioner asserts that he is entitled to relief based on a violation of a discovery request or order, the claim is non-cognizable because it is based on an alleged violation of state law. It is well-settled that there is no general constitutional right to discovery in a criminal case. See Weatherford v. Bursey, 429 U.S. 545, 559 (1977) (denying due process claim of a defendant who was convicted with aid of surprise testimony from an accomplice who was an undercover agent); United States v. Presser, 844 F. 2d 1275, 1281 (6th Cir. 1988). A claim that a prosecutor violated state discovery rules is not cognizable in federal habeas review because it is not a constitutional violation. See Lorraine v. Coyle, 291 F. 3d 416, 441 (6th Cir. 2002). Petitioner's discovery violation claim does not provide a basis for granting habeas relief.

Petitioner next challenges the admissibility of some of Rosen's testimony as either exceeding the scope of her expertise or invading the sole province of the jury. He asserts that Rosen improperly testified regarding medical matters such as whether some physical injuries to victims of domestic violence are visible, federal crime statistics, the neurobiology of trauma responses, the

psychological difficulty in "rewiring" a batterer, the likelihood that domestic abusers lie, and the unlikelihood of false reports of sexual abuse.

As to the claim that inadmissible expert testimony itself can result in a constitutional violation, "'federal habeas corpus review does not lie for errors of state law.'"  Estelle, 502 U.S. at 67 (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990).  "Errors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial."  Kelly v. Withrow, 25 F.3d 363, 370 (6th Cir. 1994).

Accordingly, a federal district court cannot grant habeas relief on the admission of an expert witness's testimony in the absence of Supreme Court precedent that shows that the admission of that expert witness's testimony on a particular subject violates the federal constitution.  See Wilson v. Parker, 515 F.3d 682, 705–706 (6th Cir. 2008). Petitioner cites no Supreme Court cases establishing a due process violation on the particular subjects to which Rosen testified.  In fact, "the Supreme Court has yet to hold that the federal constitution prohibits an expert from testifying even about an ultimate issue to be resolved by the trier of fact."  See Dicken v. Brewer, No. 2:19-CV-11676, 2019 WL 6701434, at *7 (E.D. Mich. Dec. 9, 2019) (citing Moses v. Payne, 555 F.3d 742, 761 (9th Cir. 2009)).  Cases establishing that it is the sole province of the jury to determine questions of credibility and to weigh the evidence at trial as well as the presumption of innocence, such as those cited by Petitioner, do not clearly establish that the erroneous admission of expert testimony intruding upon the province of the jury violates the Constitution.  Moses, 555 F.3d at 761.

The merits of Petitioner's claim, instead, turn on whether he can demonstrate a Sixth Amendment violation for his counsel's failure to counter Rosen's testimony.  In addressing this

claim, the Michigan Court of Appeals found that counsel performed deficiently by failing to object

to "testimony [that] went beyond that which would be relevant to the jury in evaluating the

complainant's credibility."  Evans, 2018 WL 2067794, at *5.  But it then found that reversal was

not warranted because Petitioner failed to demonstrate prejudice:

> In the instant case, review of the record reveals that Rosen was clearly qualified to
> testify regarding the areas of non-intuitive victim responses, perpetrator tactics, and
> the serial nature of domestic violence.  Much of her testimony was germane to
> provide context to various aspects of relationships involving domestic violence and
> how some victims of such violence may continue to return to the relationship even
> after violent events.  As defendant contends, however, some of her testimony went
> beyond that which would be relevant to the jury in evaluating the complainant's
> credibility in the instant case.  Defense counsel should have objected to the
> irrelevant testimony, and we can find no strategic reason for counsel's failure to
> lodge objections.  However, reversal is not warranted unless we determine the error
> was outcome determinative, and we do not.  This was a credibility match where the
> complainant and defendant provided opposite accounts of what occurred and both
> had supporting witnesses.  However, the jury was also presented with defendant's
> Facebook and text messages with the complainant where the complainant accused
> defendant of having sexually assaulted her and defendant did not deny the
> accusation.  In light of the strength of other evidence against the defendant, we find
> it improbable that defendant's trial outcome would have been different.

Id.

The court went on to find that, for the same reason, Petitioner also failed to demonstrate

that he was prejudiced by his counsel's other asserted failings with respect to Rosen.  Id. at *5–*6.

Petitioner asserts that the state court's decision is not subject to deference under the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. 2241 et seq., because

the Michigan Court of Appeals stated that "reversal is not warranted unless we determine the error

was outcome determinative."  Id. at *5.  The state court then used the phrase "outcome

determinative" twice more in discussing other aspects of the claim.  Id. at *7.  Petitioner correctly

notes that under the clearly established Supreme Court standard for adjudicating a claim of

ineffective assistance of counsel, the question is not whether "counsel's deficient performance

more likely than not altered the outcome of the case." Strickland v. Washington, 466 U.S. 668, 693 (1984).  The question, instead, is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Despite the state court's repeated use of the phrase "outcome determinative" in discussing whether Petitioner had shown that he was prejudiced by his counsel's performance, the state court applied the correct constitutional standard.  A few pages earlier in its opinion, the Michigan Court of Appeals recited the correct standard when discussing Petitioner's second claim regarding his trial counsel's failure to object to the admission of other acts of domestic violence: "To establish a claim of ineffective assistance, the defendant must show that '(1) counsel's performance was below an objective standard of reasonableness under professional norms and (2) there is a reasonable probability that, if not for counsel's errors, the result would have been different and the result that did occur was fundamentally unfair or unreliable.'" Evans, 2018 WL 2067794, at *2 (quoting People v. Odom, 740 N.W.2d 557, 563 (Mich. Ct. App. 2007)).  The state court then restated the correct standard again in setting up the discussion of the instant claim. Id. at *5 n. 4. Finally, in making its conclusion that Petitioner had not demonstrated that he was prejudiced, the court stated, "we find it improbable that defendant's trial outcome would have been different [had counsel objected]." Id. at *5.

Despite its use of the term "outcome determinative," the Michigan Court of Appeals twice correctly recited the full controlling prejudice standard when laying out the standard of review.  Te state court's conclusion that it found it "improbable that defendant's trial outcome would have been different [had counsel objected]" is just an abbreviated way of saying that it found that there

was not a reasonably probability that defendant's trial outcome would have been different had counsel objected. Most people would understand that saying that something is improbable is equivalent to saying that something is not reasonably probable.

There is no question that the state court used language in a somewhat imprecise way. But such imprecision does not overcome the AEDPA standard if it can be otherwise determined that the state court understood the correct standard. See Holland v. Johnson, 542 U.S. 649, 655 (2004) (finding that state court's use of the term "probable" in describing the petitioner's burden under Strickland, as opposed to "a reasonable probability," did not render decision contrary to federal law); Woodford v. Visciotti, 537 U.S. 19, 23-24 (2002) (finding that the California Supreme Court's occasional reference to Strickland's "reasonable probability" standard by use of the term "probable" without the modifier may have been imprecise, but it was not a repudiation of Strickland and did not render the California Supreme Court's decision "contrary to" Strickland); DeCiantis v. Wall, 722 F.3d 41, 48 (1st Cir. 2013) (determining that the state court's one-time use of an abbreviated expression of the materiality standard under Brady v. Maryland, 373 U.S. 83 (1963), did not render its decision "contrary to" clearly established Supreme Court precedent where the state court twice enunciated the correct standard and twice noted the lower state court's application of the correct standard).

The use of the phrase "outcome determinative" by the Michigan Court of Appeals was a general way to express that Petitioner was required to demonstrate a degree of actual prejudice as a result of his counsel's deficient performance. As in Holland, the state court was not required to state the precise degree of prejudice required—that of reasonable probability—each time it mentioned the prejudice requirement. It had already stated the full standard twice. The Court

therefore finds that the state court's conclusion that Petitioner was not prejudiced by his counsel's failure to challenge Rosen's testimony is subject to AEDPA deference.

Turing to the question whether the no-prejudice determination was reasonable, the analysis is further complicated by the fact that the state court did not identify exactly which parts of Rosen's testimony were improperly admitted. And, as indicated above, which parts of testimony were properly admitted is a question of state law. The state court said only that "some of [Rosen's] testimony went beyond that which would be relevant to the jury in evaluating the complainant's credibility in the instant case." Evans, 2018 WL 2067794, at *5.

The Court notes, however, that Petitioner mischaracterizes much of Rosen's testimony. Her testimony regarding the neurobiology of trauma response was based on her own experience and review of academic studies. It involved her opinion that the trauma from abuse will often impact the memories of victims of domestic violence and how they respond to abuse. Rosen had extensive experience with thousands of victims of abuse and did not purport to explain the scientific neurobiology behind the phenomena she was describing.

The DOJ statistics Rosen cited related to the proportion of people who will experience domestic abuse at least once in their lives. It was a brief remark aimed only at explaining the prevalence of domestic violence. Likewise, the CDC statistic—that one out of four women and one out of nine men will be victims of domestic abuse at some point in their lives—was used only to illustrate the danger victims face when trying to leave an abusive relationship. Rosen's testimony regarding the visibility of physical injuries did not require medical expertise. She dealt with thousands of victims over 35 years and was testifying to her experience of how frequently injuries were visibly obvious. Finally, contrary to Petitioner's suggestion, Rosen did not use Google as a scientific source for her opinions. She testified only that she sometimes would refer

clients to Google to do their own research when they did not understand the seriousness of head injuries and the need to seek immediate medical treatment for them.  Much of what Petitioner complains about has been overstated.

The testimony that the Michigan Court of Appeals found troubling more likely came when Rosen talked about the truthfulness of abusers and victims.  Largely, Rosen testified that both abusers and those who have been abused tend to lie about domestic violence.  In Rosen's experience, abusers tended to lie to their victims to manipulate them and justify their actions, and victims tended to lie to themselves and others to hide the abuse.  She did not give statistics about these statements or suggest that these statements represented the situation here.  On cross-examination she conceded that none of what she testified to necessarily applied to the facts of this case.  She did, however, testify that it was "very rare" for victims to lie about being abused when they were not abused.  Jury Trial Tr. Vol. II at 156–157.  She also testified that it was difficult to "rewire" an abuser.  Id. at 150.  It is likely this aspect of Rosen's testimony is what concerned the state court.  The testimony that false accusations are very rare is akin to statistical probability evidence that is largely considered inadmissible.  See Snowden v. Singletary, 35 F.3d 732, 737–738 (11th Cir. 1998); People v. Thorpe, 934 N.W.2d 693, 708–709 (2019).

Nevertheless, without delineating exactly which parts of Rosen's testimony should have been objected to, the dispositive point for the Court of Appeals was that contrary to Petitioner's characterization, this was not a simple word-against-word case.  It was not a case in which the jury had only the credibility of the complainant and the defendant to judge, enhancing the importance of the expert witness's intimations that victims should be believed and perpetrators not believed.  Completely absent in Petitioner's argument is an explanation for the glaring fact that Petitioner repeatedly made incriminating admissions in his text messages and Facebook communications

25

with JB immediately after the incident.  When Petitioner chose to testify in his own defense, he admitted they were indeed his messages and that he sent them to JB.  Jury Trial Tr. Vol. II at 365–366.

The text messages were sent shortly after the incident.  In the messages, Petitioner repeatedly expressed regret for what happened, said he would "burn in hell" for what he had done, and inquired from JB whether she would be calling the police.  Jury Trial Tr. Vol. at 198–206. One text read, "I realize I'm just crazy and I don't ever want to see you have to go through that again, and it was not right, that was not love." Id. at 203.  Petitioner admitted to JB that he "f*cked up big time . . . tell me if I need to worry about the police . . . but don't put me away." Id. at 204. This was powerfully incriminating evidence.  The messages started coming in soon after JB left Dell's house, and they continued until police arrested Petitioner the next day.  They were not responses by Petitioner to baiting messages sent by JB.  They were unsolicited statements made by Petitioner to JB that completely undermined his claim that JB was falsely accusing him out of petty revenge.

If there was a question remaining as to the severity of what Petitioner admitted to, the question was cleared up when JB responded to Petitioner's Facebook communication the day after the incident.  During this exchange, JB attempted to keep Petitioner communicating with her so she could lead police to Petitioner's location using one of Facebook's features.  JB responded to Petitioner's message by stating, "you raped me Micah, you fu*king raped me.  There is a special place in hell for you." Id. at 211.  Petitioner's response did not dispute the allegation of rape:

> There is a place in hell for me and I know you're going to use all that I send you [as] evidence but I'm still going to sit here and beg for your help.  On another day I could explain what my intentions were in my [mind] but it won't ever make it right.  Will you at least tell me if it was you that called the cops or someone else? . . . I know you hate me, but if you didn't call them and you didn't want this to happen either.  And then cause you love JJ [Petitioner's son] and whether you think it or

not he needs me.  If the shoe was on the other foot I wouldn't take you from your kids and you know that's true.

Id.

By agreeing that there was a "place in hell" for him and that JB would use his messages as evidence in response to JB's accusation that he raped her, Petitioner essentially acknowledged the accusation.  By stating that "on another day" he could explain his "intentions," Petitioner behaved exactly like the profile of a typical domestic abuser described by Rosen.  He wanted an opportunity to minimize and justify his conduct.  By referring to JB's love for Petitioner's son, and his son's need for a father, Petitioner attempted to play on JB's emotions.  That the contents of this response constituted a confession to raping JB would have been clear to any reasonable juror.  It is not surprising, therefore, that the prosecutor used the Facebook exchange to close his cross-examination of Petitioner.  It was a powerfully persuasive recorded admission of guilt made by the defendant to the complainant.

Further, Petitioner testified in his own defense.  During his testimony, Petitioner was offered a chance to give an innocent explanation for his messages.  He attempted to explain that the reference to him "burning in hell" was "for throwing it in her face that she was still having sex with her uncle that molested her when she was a child."  Id. at 365.  That was a non sequitur.  Nothing in Petitioner's messages or the timing of the messages suggests that he was referring to anything other than the incident that occurred on August 1.  His last message acknowledging that there was a place in hell for him was a response to JB's accusation that he raped her and was going to hell.

Thus, despite the opportunity, Petitioner offered no good reason to the jury as to why they should view his messages to JB as anything other than admissions that he raped her.  The messages to JB were critical pieces of evidence that removed this case from the category of a true word-

against-word cases in which an expert's testimony bolstering the credibility of domestic violence victims could swing the balance.  At a minimum, the messages at least provided a reasonable way for the Michigan Court of Appeals to view the record and to weigh the impact of the messages against any improperly admitted expert testimony.

It was therefore not objectively unreasonable for the Michigan Court of Appeals, in light of the content of Petitioner's messages to JB, to conclude that he had not demonstrated Strickland prejudice for his counsel's handling of the state's expert witness.  It was reasonable for the state court to conclude that there was no reasonable probability that the result of Petitioner's trial would have been more favorable had his counsel more effectively dealt with Rosen in light of Petitioner's recorded admissions to JB.  Petitioner has not established entitlement to habeas relief based on this claim.

Finally, Petitioner claims he is entitled to an evidentiary hearing on this claim.  However, in the state courts, as in this Court, Petitioner failed to proffer any evidence that he intended to present at an evidentiary hearing.  He did not provide the state court with an affidavit from a proposed defense expert.  And he did not provide the court with an affidavit from trial counsel or with any other offer of proof related to trial counsel's strategic decisions regarding Rosen. Conclusory allegations, unsupported by specific facts, are insufficient to establish entitlement to an evidentiary hearing.  Washington v. Renico, 455 F.3d 722, 733 (6th Cir. 2006).  Further, the Michigan Court of Appeals rejected the ineffective assistance of counsel claim on the merits. Because that adjudication was reasonable for the reasons stated above, no evidentiary hearing is warranted.  Cullen v. Pinholster, 563 U.S. 170, 181–182 (2011).  Petitioner has failed to demonstrate entitlement to an evidentiary hearing on his claim.

Because none of Petitioner's claims merits habeas relief, the Court denies the petition for writ of habeas corpus.

### B.  Certificate of Appealability

To appeal the Court's decision, Petitioner must obtain a certificate of appealability.  28 U.S.C. § 2253(c)(2).  The applicant is required to show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  Slack v. McDaniel, 529 U.S. 473, 483–484 (2000).  A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition.  Castro v. United States, 310 F.3d 900, 901 (6th Cir. 2002).  Here, jurists of reason would not debate the Court's conclusion that Petitioner has failed to demonstrate entitlement to habeas relief with respect to his claims because the claims are devoid of merit.  Therefore, the Court denies a certificate of appealability.

### C.  Leave to Proceed In Forma Pauperis on Appeal

While a certificate of appealability may be granted only if a petitioner makes a substantial showing of the denial of a constitutional right, a court may grant an application for leave to proceed in forma pauperis on appeal if it finds that an appeal can be taken in good faith.  28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(2).  "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits.  Foster v. Ludwick, 208 F. Supp. 2d 750, 765 (E.D. Mich. 2002).  Although jurists of reason would not debate the Court's resolution of Petitioner's claims, the issues, particularly the ineffective assistance of counsel claim as it relates to the admission of expert testimony, are not frivolous.  Therefore, an appeal could be taken in good faith, and Petitioner may proceed in forma pauperis on appeal.  Id.

## IV. CONCLUSION

For the reasons set forth above, the Court denies with prejudice the petition for writ of habeas corpus, declines to issue a certificate of appealability, and grants Petitioner leave to proceed in forma pauperis on appeal.

SO ORDERED.


Dated: June 15, 2023                          s/Mark A. Goldsmith
      Detroit, Michigan                      MARK A. GOLDSMITH
                                      United States District Judge